**In re Raymond J. TAYLOR, Jr., Debtor.**

**Bankruptcy No. 97–17004 K.**

United States Bankruptcy Court, W.D. New York.

Jan. 3, 2000.

---

**9.** The Trustee did not oppose this portion of the motion.

Scott F. Humble, Jamestown, NY, for debtor.

F. Matthew Jackson, Deily, Dautel & Mooney, LLP, Albany, NY, for creditor Lease and Rental Management Corp.

MICHAEL J. KAPLAN, Chief Judge.

In the case of *In re White*, this Court held that after confirmation of a Chapter 13 plan and during the course of the performance of the Plan, the reclassification of a claim from a "secured" class to the "unsecured" class is permitted if the secured creditor successfully pursues the opportunity to seize and realize upon the collateral. See 169 B.R. 526 (Bankr. W.D.N.Y.1994). The rationale of the case is that such result, though not determined by any statute, is an implied term of the highly cryptic Plans and Orders Confirming Plans that are used in many districts including this District.[1] Here the Court is asked whether the Debtor may "force" the same result, by insisting that the secured creditor take a car that the creditor does not want, now that the Debtor has (apparently) used the car for nearly two years since confirmation and (apparently) failed to meet the Plan obligations for payments

---

1. Our Plans typically say little more than "Secured claims will be paid in full, and unsecured claims will be paid ____%."

to the lender. The Court declines to set forth a general rule, and cannot decide this matter on the stipulated facts, which leave too many important matters unaddressed.

## BACKGROUND

The parties have stipulated to the facts as follows:

1. The Chapter 13 petition was filed on November 6, 1997.

2. The Debtor then owned a 1988 Pontiac on which the creditor "Auto Loan" (hereinafter "A.L.") had a perfected lien.

3. The Pontiac was worth at least the full amount owned to A.L.

4. On January 14, 1998, this Court confirmed a Plan that allowed A.L.'s secured claim in the amount of $5,465.01, to be paid along with a "present value" factor of a 9% rate.

5. There were other secured claims to be paid at the same time as A.L. But the Plan payments of $267 per month were expected to retire all secured debt in less than 5 years. Unsecured claims would receive only 5 cents on the dollar.

6. Between the date of filing and June, 1999 (a period of 20 months), A.L. received only $259.39 in distributions under the Plan, while the Debtor continued to use and enjoy the vehicle.

7. On June 18, 1999, the Debtor's counsel filed a purported "Amendment" to the Debtor's "Chapter 13 Statement of Intention," by which the Debtor sought to surrender the vehicle.

8. Counsel then asked A.L.'s counsel to have the vehicle taken away.

9. Without prejudice and in hopes of mitigation, A.L. agreed to do so and sought and obtained leave of Court to sell the vehicle.

10. A.L. netted $1540 after auction and credited the Debtor's account with that amount, leaving a balance of $3665.62 plus 9% present value factor, and A.L. filed an amended secured claim in that amount on September 27, 1999.

11. On October 1, 1999 the Debtor moved for an Order directing the Chapter 13 Trustee to treat the amended claim as unsecured (to receive 5 cents on the dollar), not as secured (to be paid in full).

It is that motion and A.L.'s opposition thereto that presents the matter now before the Court.

## DISCUSSION

Under the facts of the earlier *White* case, it was not necessary to interpret the statutory provisions, but rather only the common-sense implications of the Plan itself. But as to the present matter, A.L. cites substantial case authority for the proposition that Debtors may not reclassify claims under § 1329(a).[2] If the Debtor here is to prevail, this Court must either disagree with those cases, or find that it is under the Plan and the implied provisions of the Plan (or under the Order of Confirmation) that the Debtor might prevail in this case. Framed in this way, the present request to reclassify the secured claim to unsecured really asks this question: under the cryptic Chapter 13 plans used in this district, is it the debtor or the secured creditor who bears the loss of value of collateral that occurs when the debtor isn't making the plan payments that were intended and anticipated to be necessary to offset the declining value of the collateral? In even simpler terms, must a creditor carefully monitor the progress of the debtor's Chapter 13 payments and act with a "hair trigger" to seek leave to obtain and liquidate the collateral, or else suffer the

2. See, for example, *Chrysler Financial Corp. v. Nolan*, 234 B.R. 390 (M.D.Tenn.1999); *In re Meeks*, 237 B.R. 856 (M.D.Fla.1999); *In re Coleman*, 231 B.R. 397 (Bankr.S.D.Ga.1999); *In re Dunlap*, 215 B.R. 867 (Bankr.E.D.Ark. 1997); *In re Banks*, 161 B.R. 375 (Bankr. S.D.Miss.1993); *In re Holt*, 136 B.R. 260 (Bankr.D.Idaho 1992); *In re Sharpe*, 122 B.R. 708 (E.D.Tenn.1991); *In re Taylor*, 99 B.R. 902 (Bankr.C.D.Ill.1989); and *Matter of Abercrombie*, 39 B.R. 178 (Bankr.N.D.Ga.1984).

loss? Or is a debtor who knows that he or she is not making the required plan payments obliged to offer the surrender of the collateral early-on, before its value has been further eroded, or else suffer the burden to pay off the promised secured claim despite having lost the use of collateral that has worn out?

■ The facts of any particular case are important. At one extreme, a debtor might be seen to be using the Chapter 13 process as a sword rather than a shield. Clearly, a debtor ought not to be given a two, three, four or five year "window" to exercise a unilateral option of "surrender" while he runs a vehicle "into the ground." No provision of the Code, and no provision that could be reasonably implied by the Plans and Orders of the Confirmation used in this District, could support such a result. This is not simply a matter of reason and good sense, nor is it compelled by the analysis used in cases in which it is said that "reclassification" is not one of the permitted "modifications" contemplated by 11 U.S.C. § 1329. Rather, it is this writer's view that the "good faith" requirement of 11 U.S.C. § 1325(a)(3), which is incorporated into the requirements for modification by 11 U.S.C. § 1329(b)(1), is a prerequisite to anything a Chapter 13 debtor wishes to change after confirmation under § 1329 or under any "implied provision" of the Plan. And one must look at "good faith" on a case-by-case basis, always.

■ For the Court to find an absence of "good faith" does not require that the Court find "bad" faith. Rather, as this Court has often said, an absence of good faith may lay in seeking to extract too many benefits from the Chapter 13 process at a creditor's expense. Thus, for example, this Court held that "good faith" was lacking where a person was in an automobile accident; then she received a check for the damage to her car from the other driver's insurance company;[3] then she converted those proceeds to her own use without the permission of the lienor on the car; and then, she filed Chapter 13 (for other reasons) and sought to "strip down" the car lender's secured claim to the value of the car in its damaged condition. This was not a "bad faith" debtor or a "bad faith" plan, but was a plan that lacked "good faith" in the extent to which it sought to extract benefits from Chapter 13 at the secured creditor's expense.

A similar result was reached in this Court where a person (1) had leased a motor vehicle for two years, then (2) instead of surrendering the vehicle, he exercised the purchase option at the "residual" purchase price stated in the contract, with the lessor financing the acquisition, and then (3) within a few weeks thereafter filed Chapter 13 and sought to strip the value of the secured claim down to the "book" value of the car, which was substantially lower than the "residual" value that the debtor had agreed to pay immediately before filing Chapter 13. There was no indication that the Chapter 13 filing was solely to achieve this result (rather, there were valid other purposes to file Chapter 13), and therefore it could not be said that the debtor acted in "bad faith." But this Court ruled that there was an absence of "good faith" where the only thing that had changed between (1) the moment that the debtor, by arranging to purchase at the "residual" price on credit, "stipulated" the value of the vehicle at that price, and (2) the moment that the debtor sought to claim it at a lower value, was the filing of the Chapter 13 petition. (This was distinguishable from an instance where one has purchased a vehicle from a dealer, and where the vehicle did in fact lose substantial value once it left the dealer's showroom or lot. In the case that was before the Court, the vehicle had been continuously in the debtor's possession for more than two years by the time the debtor

---

**3.** Had her own insurance company been involved, any check would have been made payable jointly to her and a repair shop.

agreed to pay the "residual" price for it and then filed Chapter 13 and asserted a far lower value.)

Some persons seem to dismiss the importance of a fact-based analysis. They do so by glibly suggesting that a Chapter 13 debtor should be able to do anything in a Chapter 13 that could be accomplished by conversion to Chapter 7. That notion correctly asserts that unless what the debtor seeks to accomplish by conversion is a "substantial abuse" of Chapter 7 (11 U.S.C. § 707(b)) or is otherwise subject to dismissal or reconversion, the debtor may make new elections upon conversion.

But that view overlooks the other consequences of conversion, such as liquidation of non-exempt assets, a longer "stigma" in credit records, loss of "superdischarge," restoration of the full amount of other secured debts to be "reaffirmed," loss of opportunity to cure arrearages, and so forth. The debtor who seeks the advantage of unilateral relief from the promised treatment of a secured claim on the basis that he would be so relieved from that treatment were he to convert to Chapter 7, should suffer the disadvantages of such conversion as well.

It is often also said that a debtor should be permitted to do such things in Chapter 13 as the Debtor here wishes to do, so long as creditors are being treated at least as well as they would be in Chapter 7. This argument too often overlooks, and perhaps even demeans, the fact that Chapter 13 is thought to be a commendable alternative because it is *not* a Chapter 7 case in disguise. Not just the Chapter 7 test must be met, but also the test of "good faith" and the commitment of "projected disposable income." If creditors must fare worse in a particular Chapter 13 case because a debtor converts to Chapter 7 in order to sidestep the "good faith" requirement that prevented his intended ends in Chapter 13, then the "institution" of Chapter 13 as a "program" may be better served thereby, and many of those same creditors will fare better in cases that follow.

On the other hand, there is much to be said for encouraging an effort to succeed in Chapter 13, as opposed to an initial choice of Chapter 7. It is by assessing the "good faith" of the debtor that we assure that attempting rehabilitation instead of liquidating will not always be a "win-win" choice even for the debtor who seeks further advantage (without converting to Chapter 7) that amounts to a victimization of a creditor who did not interfere with the debtor's effort to perform the debtor's own proposal for redeeming the collateral from the lien.

All of this commands, in my view, that there be no "general rule" to be universally applied in cases in which the decision to look to the collateral itself is sought to be compelled by the debtor rather than freely chosen by the lender. Some of what happens to cars (or computers, or tools of the trade, or other property that a Chapter 13 debtor might retain subject to a prepetition security interest) is fully known and understood by a lender to be as much the lender's risk as the borrower's, such as the risk of mechanical breakdown too expensive to repair.[4] Some of what happens to payments under a Plan, too, involve risks that ought not to be borne by the debtor alone, such as where innocent miscalculations or administrative errors result in insufficient payments going to the lender (to compensate for wear and tear) despite full compliance by the debtor with the duty to make the payments that the Plan called for.

---

4. It is another "implied" term of our Plans that all of the contractual agreements between a debtor and a lienor remain in full force to the extent not inconsistent with the Plan. Thus, for example, failure of a debtor to maintain insurance required by the contract is "cause" to lift the stay, even though insurance is not even mentioned in the Plan. The contractual duty to notify the lender of a collision is another "implied" term of a Plan. There are many others.

And just as debtors might be found to be knowingly attempting to victimize a lender through the Chapter 13 process, a general rule in favor of lenders in every situation in which the lender claims it doesn't want the collateral back may itself be used by creditors, in bad faith, to try to "trap" debtors who have acted in all good faith.

So the question is a matter for case-by-case determination, based on whether the debtor is found to be acting in good faith under the circumstances and based on how the goal of fundamental fairness is to be served not only in such case, but by the Chapter 13 "program."

## CONCLUSION

Returning now to the case at bar, the Court finds that the stipulated facts are too sparse to permit a determination of "good faith." They do not disclose why the creditor received so little over a 20–month period; or why the debtor decided to surrender the vehicle at the time he did, as opposed to earlier (when it presumably had more value); or whether the loss of value was ordinary wear and tear; or (for example) whether the debtor was saving a different vehicle and piling-up the miles on the one with an eye to "sticking" the lender with it, and so forth.

Indeed, then, a case in which a debtor seeks to force the lender to take collateral is different from a case in which the creditor seeks to obtain the collateral whether the debtor agrees thereto or not. But the difference is that although it is hard to hypothesize a circumstance in which re-classification to unsecured status should not be viewed as an implied term of the Plan if the creditor is successful in taking the collateral from the debtor who wishes to keep it, every post-confirmation instance of the debtor seeking to force the lender to take the collateral while the lender says it doesn't want it must be exam-

ined to see if the blame for the loss of value that is behind the creditor's decision is to be placed on the debtor, or whether, on the other hand, the risk was one accepted by the lienor regardless of whether the borrower is or is not a Chapter 13 debtor. Continuation of what might be viewed as something akin to a "risk of loss" provision in the original, pre-petition security agreement, may be one of the "implied" provisions of the Plan.[5]

The matter is restored to the Chapter 13 Motion Calendar and will be further heard on January 24, 2000 at 12:00 noon.

SO ORDERED.

---

5. Just as in *White*, it is not here necessary for the Court to examine the cases dealing with "modifications" under 11 U.S.C. § 1329.